**UNITED STATES of America, Plaintiff,**

and

**Yonkers Branch, NAACP, et al., Plaintiff–Intervenors,**

v.

**CITY OF YONKERS, Yonkers Community Development Agency, Yonkers Board of Education, Defendants,**

and

**U.S. Department of Housing and Urban Development, Samuel Pierce, Secretary, Added–Defendants,**

and

**The State of New York; Mario Cuomo, as Governor of the State of New York; the Board of Regents of the State of New York; Martin C. Barell, R. Carlos Carballada, Adelaide L. Sanford, Willard A. Genrich, Emlyn I. Griffith, Jorge L. Bat-**tista, Lora Bradley Chodos, Louise P. Matteoni, Edward Meyer, Floyd S. Linton, Salvadore Sclafini, Mimi Levin Lieber, Shirley C. Brown, Norma Gluck, Thomas Frey and James McCabe, Sr., in their official capacities as members of the State Board of Regents; The Department of Education of the State of New York; Thomas Sobol, as Commissioner of Education of the State of New York; and The Urban Development Corporation of the State of New York and Vincent Tese, as Director of the Urban Development Corporation, Added–Defendants.

No. 80 Civ. 6761 (LBS).

United States District Court, S.D. New York.

June 14, 1995.

Michael H. Sussman, Goshen, NY, for plaintiff-intervenors NAACP.

Dennis C. Vacco, Atty. Gen. of the State of N.Y., New York City, Harvey J. Golubock, Howard L. Zwickel, Marion R. Buchbinder, Stephen Jacoby, Barry S. Schaevitz, of counsel, for New York State defendants.

Hogan & Hartson, Washington, DC, Steven J. Routh, Daniel B. Kohrman, Paul A. Minorini, of counsel, and Anderson Banks Moore Curran & Hollis, Mt. Kisco, NY, Lawrence W. Thomas, of counsel, for Yonkers Bd. of Educ. of the City of Yonkers.

Whiteside & Fitzpatrick, Birmingham, AL, Raymond P. Fitzpatrick, Jr., David P. Whiteside, of counsel, for City of Yonkers.

### OPINION

SAND, District Judge.

In an Opinion dated March 27, 1995, this Court concluded that the State of New York, the State Board of Regents, and various other State education officials (collectively, "the State"), as well as the Urban Development Corporation, were not liable under 42 U.S.C. § 1983 for the conditions of unlawful *de jure* segregation that the Court had previously found to exist in the Yonkers Public School System. *See United States v. Yonkers,* 880 F.Supp. 212, 236 (S.D.N.Y.1995). The Court declined to reach the merits of possible State liability under The Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.* ("EEOA"), a federal statute that had not been included in the original interpleader complaint against the State nor relied upon by plaintiffs as to any questions of substantive liability. *See* 880 F.Supp. at 238 & n. 32, 241. The Court indicated, however, that it would revisit the EEOA issue upon any further application of the parties. *Id.* at 241.

Presently before the Court is just such an application. The Yonkers Board of Edu-

cation and the Yonkers Branch, NAACP (collectively, "plaintiffs") have moved for leave to amend their complaint to state a claim under the EEOA and for a ruling that the State is liable under the EEOA based on the findings made in the March Opinion. Plaintiffs also move the Court to "supplement" the March Opinion by addressing the merits of their claim of State liability under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). The State opposes the motion on the grounds that plaintiffs' requests for relief under the EEOA and Title VI are both procedurally barred and meritless.

Having considered the arguments of the parties, as raised both in the motion papers and at oral argument, the Court concludes that plaintiffs are not entitled to prevail on either their EEOA claim or their Title VI claim. Our reasoning is set forth below. In addition, the Court directs the entry of a final judgment consistent with this Opinion pursuant to Fed.R.Civ.P. 54(b), so that the parties may take an immediate appeal on the issue of State liability.[1]

### I. The EEOA

A. The Procedural Propriety of Amending the Complaint

The first question before us is whether to grant plaintiffs leave to amend their complaint to state a claim against the State under the EEOA.[2] The parties agree that post-trial requests to amend the pleadings are governed by the twin standards set forth in *Hillburn v. Maher,* 795 F.2d 252 (2d Cir.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987): if the issue raised by a proposed amendment was tried with the express or implied consent of the parties, the amendment must be permitted; if there was no such consent, the amendment may be permitted if the party against whom it is offered would not be prejudiced by it, and the amendment should be granted in the absence of prejudice if "the interests of justice so require." *Id.* at 264. In this case, the question of prejudice concerns the fact that plaintiffs' EEOA claim rests on a theory of

---

1. This is consistent with the request of the parties as expressed at oral argument on plaintiffs' motion on May 25, 1995, 1995 WL 319930.

2. The manner in which the EEOA became an issue in this case is set forth in detail in the March Opinion, 880 F.Supp. at 238–41.

vicarious liability that the State claims it cannot now fairly defend against because it did not participate in the original liability proceedings against the City of Yonkers in 1983–84.

Putting the question of consent-to-litigate to one side, we believe that plaintiffs satisfy the second of the *Hillburn* standards. The issue of prejudice was raised by the State prior to trial in early 1994 when plaintiffs served on the State a number of requests for admissions relating to the Court's November, 1985 Opinion on the liability of the City. *See* Added State and UDC Defendants' Responses to the Yonkers Board of Education's Second Requests for Admissions Relating to the Court's Opinion of Nov. 20, 1985 at 3–4. The Court concluded that concerns of due process did not preclude the requested admissions, and the admissions became part of the record to the extent that the State did not seek to refute them. *See* Order of the Court dated April 7, 1994. We see no reason to upset this resolution of the matter at this point in the litigation. We note, however, that if we did perceive prejudice in holding the State to the factual findings concerning the City's liability, we would consider whether to allow the State to reopen the record and contest any of the findings deemed admitted against it.

As for the requirements of the "interests of justice," we think that the public interest in a thorough resolution on the merits of a claim is particularly compelling in civil rights litigation such as this. We accordingly grant plaintiffs' motion to amend the complaint to state a claim under the EEOA.

## B. The Merits of the EEOA Claim

[3] Section 204 of the EEOA provides in relevant part that:

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by (a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools; (b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps ... to remove the vestiges of a dual school system....

20 U.S.C. § 1703. For purposes of section 1703, an "educational agency" can be a local educational entity such as the Yonkers Board of Education. *See* 20 U.S.C. §§ 1720(a), 2891(12), 3381.

The question before us is whether this provision of the EEOA provides a basis for holding a state vicariously liable for the discriminatory acts of local educational authorities. In the March Opinion, we perceived this question to resolve itself into a choice between following the literal and unambiguous language of section 1703, which seemed to impose on states the type of supervisory liability foreclosed under 42 U.S.C. § 1983, and looking beyond section 1703's language to the legislative history of the EEOA, which strongly suggested that Congress did not intend the statute to afford protections against racial discrimination beyond those already provided under the Fifth and Fourteenth Amendments of the Constitution.[3]

Further reflection on the matter in light of the subsequent briefing and oral argument by the parties has convinced us of several things. First, it does not appear that we are in fact faced with a clear-cut choice between the language of the statute and its legislative history. For one thing, the literal language of section 1703 is not as unambiguous as we initially thought.[4] For another, the internal incongruity of the EEOA's substantive provisions, while not creating ambiguity *per se*, raises serious doubts about what Congress intended to achieve by passing the EEOA.[5]

---

3. *See* 880 F.Supp. at 239–41.

4. The State argues that the introductory phrase "No State shall" in section 1703 is a term of art denoting the general concept of state action and that its inclusion in section 1703 is simply Congress' way of saying that the proscriptions of that provision are to apply to state, but not to private, actors. Though this reading renders section 1703 slightly redundant in style (since the term "educational agency" in section 1703 is already defined to include only public authorities, be they state or local), it is not for that reason implausi-

ble. At the very least it calls into question plaintiffs' contention that the phrase "No State shall" is meant to single out the fifty United States, as opposed to state actors in general, for liability for unlawful segregation in the schools, regardless of its cause.

5. With the exception of section 1703 and certain other provisions relating to jurisdiction and standing to bring suit, the entire statute is devoted to disciplining and limiting the ways in which federal courts may proceed in remedying unlawful school segregation and to identifying and

We now believe that the plain language and structure of the EEOA prompt enough questions concerning Congress' purpose in enacting section 1703 as would justify recourse to the EEOA's legislative history. *See Lewis v. Grinker*, 965 F.2d 1206, 1215 (2d Cir.1992) (noting that it is particularly appropriate to look beyond the literal meaning of statutory language when the statute "produces an unexpected result and when there is strong reason to doubt that Congress intended that result"). And, as even plaintiffs appear to concede, the legislative history supports the State's position more than their own.[6]

More important still, however, is our recognition that the relevance of the EEOA to this case does not turn in the first instance on whether section 1703 was intended to provide a basis for vicarious state liability in desegregation cases. Rather, assuming *arguendo* that it was so intended, the key question is whether the State can be forced to participate in a remedial scheme that is now ten years old and that was neither devised nor implemented with the prescriptions and priorities of the EEOA in mind.

As several courts have recognized, the EEOA does not so much purport to limit the ultimate remedial powers of the courts in desegregation cases as it tries to ensure that courts impose certain vigorous remedies (such as the compulsory transportation of students) only as a last resort, after due and explicit consideration of more moderate alternatives. *See, e.g., Morgan v. Kerrigan*, 530 F.2d 401, 412–13 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976). For example, section 214 of the EEOA lists and prioritizes a set of remedial options that a court must consider and make specific findings upon *before* it proceeds to

formulate a remedy that "involve[s] directly or indirectly the transportation of students...." 20 U.S.C. § 1713. Similarly, section 256 of the EEOA provides that no court may order the implementation of any plan to remedy a finding of *de jure* segregation which involves the transportation of students *unless* it first finds that "all alternative remedies are inadequate." 20 U.S.C. § 1755.

The remedial plan that was devised ten years ago for the Yonkers school system, to which the State would become a party if found liable at this stage of the proceedings, utilizes, albeit to a minimal degree, mandatory busing. Although at the time it was the working assumption of both the Yonkers Board of Education and the Court that mandatory busing was necessary to the achievement of a constitutionally-adequate remedy for Yonkers, the Court never made (nor was requested to make) specific findings regarding the efficacy of remedies other than busing.

We do not think it would be consistent with Congress' intent in adopting the EEOA to require the State to participate in a remedial plan that does not comport with the requirements of a statute applied retroactively to it. Nor do we think it would be sound, from any perspective, to reopen at this late stage in these proceedings questions relating to the proper scope of a remedial plan adopted and implemented a decade ago. Regardless of whether the State can be held vicariously liable as a matter of law under section 204 of the EEOA, we conclude that it cannot lawfully be made to participate in the remedial plan now in place in Yonkers. The State therefore cannot be held accountable under the EEOA in this case.[7]

---

emphasizing those actions and conditions which *do not* constitute denials of equal educational opportunity. Furthermore, Congress' sole expressed purpose in passing the EEOA—to "specify appropriate remedies for the orderly removal of the vestiges of the dual school system," 20 U.S.C. § 1701(b)—has nothing to do with articulating standards of liability for segregation in the first instance, much less with articulating standards that depart from well-established constitutional norms. Though plaintiffs insist there is nothing inherently inconsistent in Congress' deterring certain types of school desegregation efforts by federal courts and agencies on the one hand, and Congress' burdening the states with

new, affirmative duties of discrimination prevention on the other hand, we think the tension between these aims is clear.

**6.** *See* Plaintiffs' Reply Memorandum in Support of the Yonkers Branch, NAACP's and the Yonkers Board of Education's Motion for Leave to Amend Pleadings and for Supplementation of the Court's Opinion of March 27, 1995 at 22–23; Yonkers Board of Education's Supplemental Brief in Response to the Court's Order of February 28, 1995 on the Equal Education Opportunities Act at 5.

**7.** Section 217 of the EEOA, which provides that a desegregation plan need not comply with the

## II. Title VI

### A. The Procedural Propriety of Supplementation

■ Plaintiffs ask us to "supplement" the March Opinion by including a decision on the merits of their Title VI claim. We see no reason to deny the request. The Title VI claim is one that plaintiffs pleaded early on, including it in their complaint against the State. The claim was not addressed on its merits in the March Opinion, not because it was not procedurally before the Court, but because it was not the subject of focused attention by the parties. The procedural bars that the State raises against supplementation—Rule 59(e), Fed.R.Civ.P., and Local Rule 3(j)—are not relevant. The 10–day time limit of Rule 59(e) begins to run only upon "entry of the judgment"; and the March Opinion, which among other things invited the parties to make further application to the Court within 20 days of its issuance, *see* 880 F.Supp. at 217, 245, does not constitute a "judgment." *See* Fed.R.Civ.P. 58. Local Rule 3(j) applies by its express terms only to a court's determination of an original "motion," not to judicial findings of fact and conclusions of law following a bench trial. We will accordingly proceed to address the merits of plaintiffs' Title VI claim against the State.

### B. The Merits of the Title VI Claim

■ Title VI provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Plaintiffs argue that when read in light of its language, purpose, legislative history, and implementing regulations, Title VI provides a basis for holding the State liable for its failure to prevent the unlawful conditions of racial segregation in the Yonkers schools. In particular, plaintiffs argue that when a recipient of federal funds (such as the State of New York) distributes the funds or otherwise arranges for them to flow to some other agency (such as the Yonkers Board of Education), the recipient assumes an affirmative obligation to ensure that the agency complies with the dictates of Title VI and uses those funds in a non-discriminatory manner. On this argument, Title VI does not merely require a recipient of federal funds to refrain from doing wrong itself; it requires a recipient to actively restrain the wrongdoing of those entities or agents to whom it conveys the use of federal monies.

We would begin by noting that there is nothing implausible in this reading of Title VI as such. Title VI was enacted as Spending Clause legislation, which means that it rests on the power of Congress to set the terms on which federal financial assistance will be made available to state and local governments and private actors. *Guardians Ass'n v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 598–99, 103 S.Ct. 3221, 3230–31, 77 L.Ed.2d 866 (1983) (White, J. joined by Rehnquist, J.). Surely one option that Congress might have wished to extend to potential state recipients was that of policing the local uses of federal funds in exchange for receiving the funds in the first instance and enjoying some discretion in distributing them.

That said, we must recognize plaintiffs' construction of Title VI for what it is—an argument that the statute imposes on states liability for failing to ensure that local governments receiving federal flow-through funds do not discriminate on the basis of race. Although this supposed liability is not "vicarious" in the strictest sense (since it is based on a duty that is separate and distinct from the primary duty not to discriminate), it would clearly render a state legally responsi-

---

standards set forth in the EEOA as long as the plan is voluntarily proposed by the "appropriate educational agency," does not disturb our holding. "Voluntary," to our mind, means a willingness to do something in light of all the material facts bearing upon the particular decision. Because the Court's obligations under the EEOA were not an issue in the initial liability and

remedy proceedings involving the City of Yonkers ten years ago, we cannot conclude that the Yonkers Board of Education "voluntarily proposed" the remedial plan now in place when in good faith it designed a set of desegregation steps that incorporated mandatory busing in response to the Court's orders.

ble for racial discrimination that the state itself did not intentionally contribute to or cause.

■ The question before us is whether Title VI imposes this type of "quasi-vicarious" liability. The most relevant authority on this point is *Guardians Ass'n v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). In *Guardians,* a majority of the Court reaffirmed the conclusion of *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 287, 328, 352, 98 S.Ct. 2733, 2746, 2767–68, 2779, 57 L.Ed.2d 750 (1978), that liability under Title VI is coextensive with liability under the Equal Protection Clause of the Fourteenth Amendment. *See Guardians,* 463 U.S. at 610–11, 103 S.Ct. at 3236–38 (Part II of concurring opinion of Powell, Rehnquist, JJ., and Burger, C.J.); *id.* at 612, 103 S.Ct. at 3238 (O'Connor, J., concurring in the judgment); *id.* at 639–42, 103 S.Ct. at 3252–54 (Stevens, Brennan, and Blackmun, JJ., dissenting). "In view of the clear legislative intent," the *Bakke* majority had written, "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Bakke,* 438 U.S. at 287, 98 S.Ct. at 2746 (opinion of Powell, J.). *See also United States v. Fordice,* —— U.S. ——, —— n. 7, 112 S.Ct. 2727, 2737 n. 7, 120 L.Ed.2d 575 (1992) (more recently stating that Title VI's protections extend no further than the Fourteenth Amendment). We therefore must look to constitutional standards to determine the reach of Title VI in this case.

■ It is well-established that the Equal Protection Clause prohibits only intentional or purposeful discrimination. *Washington v. Davis,* 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976); *Keyes v. School Dist. No. 1,* 413 U.S. 189, 205, 208, 212–13, 93 S.Ct. 2686, 2696, 2697, 2699–2700,

37 L.Ed.2d 548 (1973) (finding, in the schools context, that only *de jure* segregation, or "a current condition of segregation resulting from intentional state action," was constitutionally impermissible and the proper predicate for enforced remedial action). This means that the discriminatory effect of a law or a condition of segregation offends the Constitution only if it can be said to result from a discriminatory state purpose. *Washington,* 426 U.S. at 240, 96 S.Ct. at 2048.

In this case, acts of intentional racial discrimination have undoubtedly been found, but they have been found only on the part of local Yonkers officials, not on the part of the State defendants. *See* 880 F.Supp. at 236, 245. This is important, because the discriminatory state purpose that must exist before a violation of the Equal Protection Clause can be found is a form of intent, and intent—be it measured by a subjective standard, an objective standard, or a blend of the two—inheres in actors, not in situations or conditions. In our view, a state no more "intentionally" fosters racial segregation by failing to prevent local acts of intentional segregation than it "intentionally" fosters racial segregation by failing to alter adventitious housing patterns—in other words, it does not unconstitutionally discriminate in either instance. *See Hart v. Community School Board,* 512 F.2d 37, 47–51 (2d Cir.1975) (explicating the intent-to-discriminate requirement under the Constitution and assuming that "mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation"); *Arthur v. Nyquist,* 573 F.2d 134, 143 (2d Cir.) (concluding that the test for discriminatory intent fashioned in *Hart* remains valid in the wake of the Supreme Court's decision in *Washington v. Davis* ), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978).[8]

Because a state's failure to prevent local acts of segregation, without more, does not

---

8. Our conclusion here draws heavily on our inquiry in the March Opinion into the scope of the State's liability under 42 U.S.C. § 1983. And for good reason. Although we recognize that section 1983 is in some ways a "peculiar" statute, in that it contains a state action requirement and a requirement that the tort-feasor be a "person," we see little basis for concluding that it contains a standard of discriminatory intent different from

the standard enunciated in the cases interpreting the Constitution directly, such as *Washington* and *Keyes.* Certainly *Arthur v. Nyquist,* the Second Circuit case interpreting the Constitution's discriminatory-intent requirement through the prism of section 1983, did not indicate that there was any difference in the standards. Nor do we readily see how a state actor could be found not

offend the Constitution, we conclude, on the authority of *Bakke* and *Guardians,* that the State's conduct vis-a-vis the Yonkers public schools does not offend Title VI. We accordingly reject plaintiffs' argument that the language, purpose, and legislative history of Title VI compel a finding of State liability under that statute.

■ Still to be considered are the implications of the Title VI regulations. For although one majority of the *Guardians* Court accepted the principle that Title VI reaches no further than the Constitution in terms of the protections it affords, another majority of the *Guardians* Court was persuaded that Title VI permits the enactment of implementing regulations that do go beyond the Constitution. *See Guardians,* 463 U.S. at 591–93, 103 S.Ct. at 3226–28 (White, J.); *id.* at 617–24, 103 S.Ct. at 3240–44 (Marshall, J., dissenting); *id.* at 642–45, 103 S.Ct. at 3253–55 (Stevens, Brennan, and Blackmun, JJ., dissenting). Specifically, a majority of the Justices in *Guardians* held that although Title VI itself does not prohibit the use of federal funds in programs that have a disparate impact on racial minorities, administrative regulations passed pursuant to Title VI could legitimately incorporate an "impact" or "effects" standard. The question before us would thus seem to be whether Title VI's implementing regulations provide a basis for holding a state recipient of federal financial

assistance liable for the racially discriminatory acts of local subrecipients.

■ We hold that they do not, for several reasons. The first has to do with the manner in which plaintiffs have presented the question to the Court. Plaintiffs ask us to read Title VI in light of its implementing regulations. That is, they ask us to use the regulations as a tool of interpretation, furnishing a perspective with which one is to read Title VI in order to ascertain its true meaning.[9] Consistently with this approach, plaintiffs have never alleged any claim under the Title VI regulations *per se.* Rather, they continue to invoke only the statute itself.

[10] The problem here is that it is unclear whether the type of interpretive inquiry urged by plaintiffs is open to us. The majority of the *Guardians* Court that agreed to look to Title VI's regulations for guidance on the disparate-impact issue failed to make clear whether they believed the regulations were of the "interpretive" variety (*i.e.,* regulations that merely inform a court's interpretation of a statute), or of the "legislative" variety (*i.e.,* regulations that are passed by agencies pursuant to delegated law-making authority and that have the force of law binding upon the courts). *See generally National Latino Media Coalition v. F.C.C.,* 816 F.2d 785, 787–88 (D.C.Cir.1987) (analyzing the differences between the two types of agency regulations).[10] The distinction mat-

---

to have "subject[ed], or cause[ed] to be subjected" a complainant to racial discrimination (the test under section 1983) and yet at the same time be found to have undertaken action with an intent to produce a condition of racial segregation (the test under *Washington* and *Keyes*).

9. Title VI's regulations, say plaintiffs, "represent 'early interpretations of the statute by the agencies charged with enforcement,' [and] should be accepted as embodying a proper reading of Title VI 'absent clear inconsistency with the face or structure of the statute, or with the unmistakable mandate of the legislative history.'" Plaintiffs' Memorandum in Support of the Yonkers Branch, NAACP's and the Yonkers Board of Education's Motion for Leave to Amend Pleadings and for Supplementation of the Court's Opinion of March 27, 1995 at 29 (quoting *Guardians,* 463 U.S. at 592, 103 S.Ct. at 3227 (White, J.)). *See also* Plaintiffs' Letter to the Court Dated May 22, 1995 at 1 ("We submit that ... the Title VI implementing regulations should be considered and deferred to in interpreting Title VI, absent a clear conflict with the statutory language....").

10. Some of the members of the *Guardians* majority that relied on the Title VI regulations used language and argued from standards that are more characteristic of interpretative regulations than of legislative regulations. For example, both Justices White and Marshall framed the issue in terms of deferring to the construction of Title VI as contained in its regulations. Both focused on the timing and consistency of the agencies' position that Title VI prohibited disparate impact, as well as on the expertise of the administrators involved in fashioning the regulations. *See Guardians,* 463 U.S. at 592–93, 103 S.Ct. at 3227–28 (White, J.); *id.* at 618–23, 103 S.Ct. at 3241–44 (Marshall, J., dissenting). As the Supreme Court has recognized, timing, consistency, and agency expertise are all factors that courts traditionally consider in judging the authoritativeness of interpretative regulations. *See Batterton v. Francis,* 432 U.S. 416, 424–25 & n. 9, 97 S.Ct. 2399, 2405 & n. 9, 53 L.Ed.2d 448 (1977).

Justices Stevens, Brennan, and Blackmun, on the other hand, focused on Congress' delegation

ters in the following sense: if the *Guardians* majority understood the Title VI regulations to be interpretive, we could accept plaintiffs' invitation to read Title VI through its regulations and determine whether the statute, as glossed, provides for an outcome not required by the statute alone. If, however, the *Guardians* majority understood the regulations to be legislative, we would regard the regulations as law, related to but independent of the statute, and we would look to the regulations themselves to decide the issue before us. Yet here a further difficulty arises because, as noted above, plaintiffs have not pleaded the regulations as an independent cause of action.

All of this uncertainty is arguably enough to deny plaintiffs' motion. However, even if we were to assume that we can treat Title VI's implementing regulations as interpretive, and revisit Title VI's meaning through their prism, we do not believe that the regulations provide a concrete enough basis for holding the State liable for the racial discrimination in the Yonkers schools.

To begin with, the Title VI regulations are not nearly as specific on the issue of vicarious liability as they are on the issue of disparate impact. For example, 34 C.F.R. § 100.3(b)(2) (Department of Education), one of regulations at issue in *Guardians,* addresses the question of disparate impact in the following straightforward manner:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such

program ... *may not,* directly or through contractual or other arrangements, utilize criteria or methods of administration *which have the effect* of subjecting individuals to discrimination because of their race, color, or national origin, or *have the effect* of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

(emphases added). In contrast, the regulations cited by plaintiffs as a basis for imposing vicarious state liability provide, in pertinent part:

> A recipient under any program to which this subpart applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin[,] [discriminate in the administration of the services, financial aid, or benefits provided under the program].

34 C.F.R. § 100.3(b)(1) (Department of Education).

> The term "program" includes any program, project, or activity for the provision of services, financial aid, or other benefits to individuals (including education or training, rehabilitation, housing, or other services, whether provided through employees of the recipient of Federal financial assistance or provided by others through contracts or other arrangements with the recipient ...)....

34 C.F.R. § 100.13(g) (Department of Education). We agree with plaintiffs that the most natural reading of these latter two regulations is that they forbid recipients of federal financial assistance from discriminating indirectly, through third parties, as well as directly by their own hand. But indirect

---

of law-making power to the agencies charged with the distribution of federal financial aid, and they invoked the "reasonable relation test" set forth in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660–61, 36 L.Ed.2d 318 (1973), which is used to assess the validity of legislative regulations. *See Guardians,* 463 U.S. at 643, 103 S.Ct. at 3254 (Stevens, Brennan, and Blackmun, JJ., dissenting). Justice O'Connor, although of the view that the Title VI regulations could not reach beyond the statute itself, nonetheless assumed that the regulations were legislative in nature. *See id.,* 463 U.S. at 613–15, 103 S.Ct. at 3238–40 (O'Connor, J., concurring in the judgment).

There are suggestions in cases decided after *Guardians* that Title VI's implementing regulations are legislative in nature, and that a party must rely on those regulations independently of the statute itself. *See, e.g., Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) (noting that *Guardians* held that "actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI"); *Association of Mexican–American Educ. v. California,* 836 F.Supp. 1534, 1546–48 (N.D.Cal.1993) (following *Guardians* and considering whether there is a private right of action under the Title VI regulations incorporating a disparate impact standard).

discrimination is not necessarily the same thing as vicarious or quasi-vicarious discrimination. If it were, it would be difficult to understand the many cases interpreting section 1983 (under which there is no vicarious liability) which hold that a state actor may subject a person to a violation of his rights by creating a custom or policy under which third parties commit unconstitutional acts. *See, e.g., Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

Plaintiffs also rely on a set of Title VI regulations that require the states to be administratively involved in monitoring the use of federal funds. For example, both 28 C.F.R. § 42.105(d) (Department of Justice) and 34 C.F.R. § 100.4(b) (Department of Education) require state recipients of continuing federal financial assistance to give assurances that programs receiving assistance are conducted in a non-discriminatory manner, and to provide for such methods of administration of the programs as to assure federal authorities that the state recipient and its subrecipients are complying with Title VI. Another regulation, 34 C.F.R. Part 100, Appendix B(II)(B) (Department of Education), requires that the state agency responsible for the administration of vocational education programs adopt a compliance program to prevent, identify, and remedy racial discrimination on the part of its subrecipients. Among other things, this compliance program must include periodic reviews of selected subrecipients. Upon a finding of unlawful discrimination, the state agency must notify the subrecipient of steps it needs to take to get into compliance with Title VI, and the state agency must attempt to obtain voluntary compliance.

There is no denying that regulations such as these indicate a determination on the part of federal authorities to get states involved in the policing of federal funds. But in our view, state-level oversight responsibilities in and of themselves can serve purposes—such as administrative efficiency—having little to do with a concern to apportion ultimate legal responsibility for violations of Title VI. We recognize that the implementing regulations as a whole, and the regulations establishing procedures for investigating and sanctioning Title VI violations, in particular, seem more concerned with the bare fact of a violation of Title VI than with the identity of the violator as such. *See, e.g.,* 34 C.F.R. § 100.8(a) (Department of Education) (noting simply that "[i]f there appears to be a failure or threatened failure to comply with this regulation, and if the non-compliance or threatened non-compliance cannot be corrected by informal means, compliance ... may be effected by the suspension or termination of ... Federal financial assistance or by any other means authorized by law"). We believe, however, that if the Title VI regulations are to reach beyond Title VI itself, as *Guardians* says they may, they must do so by way of something more definite than what can be gleaned through suggestion and inference.

In sum, because it is unclear how we are to take cognizance of the Title VI regulations, because one of those ways is foreclosed by the posture of plaintiffs' pleadings, and because we do not find the regulations definite enough to impose vicarious liability, we deny plaintiffs' Title VI claim against the State.

### Conclusion

For the foregoing reasons, plaintiffs' motion for a ruling that the State is liable under the EEOA and/or Title VI is denied. The Court finds that there is no just reason to delay entry of a final judgment on plaintiffs' claims against the State, and accordingly directs the entry of a final judgment dismissing all claims against the State defendants pursuant to Fed.R.Civ.P. 54(b).[11]

SO ORDERED.

---

11. The alternative to entry of a Rule 54(b) order would be to compel plaintiffs to proceed with the remedy phase of these proceedings against the City of Yonkers itself. Prior holdings of this

Court have already established that the City is liable and that vestiges of segregation remain in the Yonkers public school system. *See* 880 F.Supp. at 245. Plaintiffs have disclaimed any

interest in proceeding at this time solely against the City and this Court will defer to that preference, which of course involves political and economic ramifications which the parties are better able than the Court to assess.