UNITED STATES of America, Plaintiff,

Yonkers Branch—National Association for the Advancement of Colored People, et al., Plaintiffs–Appellants,

v.

CITY OF YONKERS; Yonkers Community Development Agency; and U.S. Department of Housing and Urban Development, Samuel Pierce, Secretary, Defendants,

Yonkers Board of Education, Defendant–Appellant,

The State of New York; George E. Pataki, as Governor of the State of New York; Board of Regents of the State of New York; Martin C. Barell; R. Carlos Carballada; Adelaide L. Sanford; Willard A. Genrich; Emlyn I. Griffith; Jorge L. Battista; Lora Bradley Chodos; Louise P. Matteoni; Edward Meyer; Floyd S. Linton; Salvadore Sclafini; Mimi Levin Lieber; Shirley C. Brown; Norma Gluck; Thomas Frey; James McCabe, Sr., in their official capacities as members of the State Board of Regents; Department of Education of the State of New York; Thomas Sobol, as Commissioner of Education of the State of New York; Urban Development Corporation of the State of New York; Vincent Tese, as Director of the Urban Development Corporation, Defendants–Appellees.

Nos. 1450, 1451, Dockets 95-6182, 95-6206.

United States Court of Appeals, Second Circuit.

Argued April 11, 1996.

Decided Sept. 23, 1996.

Michael H. Sussman, Goshen, NY, for Plaintiffs–Appellants.

Steven J. Routh, Washington, DC (Daniel B. Kohrman, Paul A. Minorini, Hogan & Hartson, Washington, DC, Lawrence W. Thomas, Anderson, Banks, Curran & Donoghue, Mt. Kisco, NY, on the brief), for Defendant–Appellant.

Marion R. Buchbinder, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, Victoria A. Graffeo, Solicitor General, Barbara Gott Billet, Deputy Solicitor General, Nancy A. Spiegel, Stephen M. Jacoby, Assistant Attorneys General, New York City, on the brief), for Defendants–Appellees.

Before: KEARSE and ALTIMARI, Circuit Judges, and MORAN, District Judge.*

KEARSE, Circuit Judge:

Plaintiffs-appellants National Association for the Advancement of Colored People, *et al.* ("NAACP"), and defendant Yonkers Board of Education ("Board of Education" or "Board"), a cross-claimant (collectively "plaintiffs"), appeal from a judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, dismissing their complaint under 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), and the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.* ("EEOA"), against defendants The State of New York ("New York State") and various of its officials and agencies, including the Governor and the New York Board of Regents (collectively the "State"), and the New York State Urban Development Corporation and its director (collectively "UDC"). Plaintiffs contended that the housing and school segregation previously found to exist in the City of Yonkers ("Yonkers" or the "City") in violation of the Constitution and federal statutory law, *see* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2d Cir.1987), *cert. de-*

---

* Honorable James B. Moran, of the United States District Court for the Northern District of Illinois, sitting by designation.

*nied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), was contributed to by the State and UDC and that those defendants should assist in remedying the vestiges of that segregation. The district court, although finding that the State and UDC had failed to take effective action despite the fact that they knew or should have known of the *de jure* segregation in Yonkers, concluded principally that plaintiffs' complaint must be dismissed on the grounds that their claims were foreclosed by this Court's decision in *Arthur v. Nyquist*, 573 F.2d 134 (2d Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), and that the claims against UDC were barred by the statute of limitations. On this appeal, plaintiffs challenge the court's legal conclusions. For the reasons that follow, we conclude that plaintiffs' claims are not foreclosed by *Arthur v. Nyquist*, and we accordingly vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The early history of this litigation and the events leading to it have been explored extensively in prior published opinions of this Court and the district court. The action, charging housing and school segregation in violation of the Equal Protection Clause and various federal civil rights statutes, was commenced by the United States in 1980, was joined by NAACP, and was pursued as a class action against the City, the Board, and the Yonkers Community Development Agency. After a lengthy trial, the district court found those defendants liable for intentional discrimination in housing and education, *see* 624 F.Supp. 1276 (1985) (*"Yonkers I"*), fashioned remedial orders, *see* 635 F.Supp. 1538 and 1577 (1986) (*"Yonkers II"*), and entered judgment accordingly. This Court affirmed the judgment of the district court in all respects. *See* 837 F.2d 1181 (1987) (*"Yonkers III"*), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). Familiarity with those opinions is assumed.

At the time of those decisions, the State and UDC were not parties to the action.

### A. *The Addition of the State and UDC as Defendants*

In 1987, NAACP moved to add the State and UDC as parties defendant. The Board, which the district court found had by then, "[a]s a result of [the Board's] good faith and zealous implementation" of the district court's 1986 remedial order, "achieved desegregation of enrollments among the schools," 833 F.Supp. 214, 216 (1993) (*"Yonkers IV"*) (internal quotation marks omitted), sought leave to file a cross-claim against the State and UDC. NAACP and the Board alleged that while the Board's implementation of the court's remedial order had had an immediate inter-school desegregative effect, it would not be effective either (a) to eliminate, to the extent practicable, inequalities in the educational program, intra-school segregation, and other vestiges of the prior unlawful segregation in Yonkers, or (b) to maintain desegregation. Plaintiffs contended that the State and UDC had known of the *de jure* segregation in Yonkers; had nonetheless, in response to pressures they knew to be race-related, failed to take effective action to eliminate that segregation and had contributed to it; and should be compelled to assist in eliminating the vestiges of that segregation. After holding the motions in abeyance pending plaintiffs' attempts to obtain the State's consensual assistance, the district court in 1989 granted the motion to add the State and UDC as defendants.

After several unsuccessful attempts by the State and UDC, both in the district court and on appeal, to have the case against them dismissed summarily, the district court held trials on the questions of (a) whether unaddressed vestiges of unlawful segregation continued to exist in the Yonkers schools, and (b) if so, whether and to what extent the State and UDC were liable. In its vestiges decision, rendered after a three-week trial in 1993, the court defined "vestige of segregation" as "a policy or practice which is traceable to the prior *de jure* system of segregation and which continues to have discriminatory effects," *Yonkers IV*, 833 F.Supp. at 218–19, and found that vestiges of segregation remained in the Yonkers schools, noting, *inter alia*, "that although minority students in

Yonkers attend school in the same buildings as majority students, they are undergoing different educational experiences," *id.* at 225. The court found that compliance with the existing remedial orders would be inadequate to eliminate the vestiges of segregation.

The vestiges decision was not embodied in a final judgment and the State's immediate appeal seeking review of that decision was dismissed. The merits of the vestiges decision are not before us on this appeal.

In 1994, the court held a six-week trial on whether or not the State and UDC should be held liable for Yonkers's unlawful school segregation and its vestiges. Plaintiffs contended, *inter alia,* that those defendants were liable because (1) State education officials knew that *de jure* segregation existed and was increasing in Yonkers schools but took no steps to prevent or remedy that segregation; (2) State education officials failed to implement established New York State policy which required eradication of even *de facto* segregation, and their conduct was motivated by racially-based community and political opposition to that policy; and (3) UDC, though initially proposing scattered-site family-housing construction that would have lessened housing segregation in Yonkers, capitulated to what it knew to be race-based community and City pressure and participated in placing all of its subsidized family-housing projects in the already predominantly minority southwest section of the City, *see, e.g., Yonkers III,* 837 F.2d at 1240–41 (Appendices A and B), thereby exacerbating school segregation. In support of their contentions, plaintiffs presented evidence of, *inter alia,* the knowledge of the State and UDC of segregation and related inequalities in Yonkers; defendants' knowledge of the motivations of local officials and their constituents in opposing desegregation; and the power of the State to take steps to achieve desegregation, including the authority conferred on its Commissioner of Education ("Commissioner") by N.Y. Educ. Law § 310 (McKinney 1995) to initiate quasi-judicial proceedings *sua sponte* to enforce New York's education policies.

The court received thousands of exhibits and received testimony from more than 30 witnesses, including members and former members of the New York Board of Regents, a former Commissioner, a former Deputy Commissioner, key officials from the State Education Department ("SED"), the former head of UDC, and UDC officials who were responsible for the agency's housing activities in Yonkers. The court also heard testimony from City officials and community leaders who had interacted with the State and UDC on school and housing matters.

Following that trial, the court handed down the two liability opinions at issue on this appeal. In the first, 880 F.Supp. 212 (1995) (*"Yonkers V"*), the court made factual findings that were largely favorable to plaintiffs; but it concluded that the § 1983 claims against the State officials were precluded by *Arthur v. Nyquist,* 573 F.2d 134, and that those against UDC were time-barred. In the second opinion, 888 F.Supp. 591 (1995) (*"Yonkers VI"*), the court concluded that the facts established were insufficient to make the State liable under Title VI or the EEOA.

## B. Yonkers V: *Dismissal of the § 1983 Claims*

### 1. *The District Court's Findings With Regard to Schools*

In *Yonkers V,* the district court considered plaintiffs' claims under § 1983 and made factual findings with regard to the State's knowledge, its power, its conduct, and its motivation.

With respect to knowledge, the court found that there could be no doubt whatever that the State was aware early of the existence of segregation in the Yonkers public schools, and it found that the State knew or reasonably should have known that the segregation was *de jure.* It found that "the State defendants were aware of circumstances that should have alerted them to the likelihood that Yonkers had a substantial problem of unlawful segregation in its schools" and that "if in fact the State defendants were not so alerted, it was because they themselves chose to remain ignorant" "in the face of actual conflicting evidence," *Yonkers V,* 880 F.Supp. at 219, 220; that the State thus had "actual or constructive[ ] knowledge of illegal racial

segregation in the Yonkers public schools," *id.* at 220; that the State indeed had "full knowledge of the nature, cause and extent of the segregation in the Yonkers public schools," *id.* at 245; and that "SED can fairly be charged with knowing that Yonkers, if left to its own devices, was not going to remedy the segregation voluntarily," *id.* at 219.

> In sum, ... the State knew about the segregation that existed in the Yonkers Public Schools, knew that Yonkers would not on its own take the steps necessary to end the segregation, and either knew or reasonably should have known that the segregation was *de jure* rather than *de facto*.

*Id.* at 220.

The court found that the State defendants had the authority to take steps to eliminate the segregation, whether *de jure* or *de facto*, in the Yonkers schools. The court found, *inter alia*, that "New York law has prohibited *de jure* segregation since 1900"; that "[a]s early as 1960, the New York State Board of Regents issued a policy statement urging school districts to take the steps necessary to end *de facto* desegregation in New York's public schools"; that "the Regents reaffirmed that position in a series of subsequent racial integration policy statements"; and that there were numerous statutorily authorized options by which the anti-segregation statute, *see* N.Y. Educ. Law § 3201(1) (McKinney 1995), and the policy statements "could have been enforced by the Commissioner." *Yonkers V*, 880 F.Supp. at 220. The cited options included withholding state financial aid from Yonkers, removing school officials, initiating a proceeding designed to investigate and remedy the segregative conditions, promulgating regulations, and withholding approval of the purchase or building of new school facilities. *See id.* at 220–22. The court concluded that the State "possessed the full means and authority needed to deal with Yonkers school segregation, had it been inclined to do so." *Id.* at 245.

The district court further found that normally "SED is one of the most activist state educational bodies in the country, .... vigorously monitor[ing] and regulat[ing] many different aspects of education, including special education, bilingual education, vocational training, achievement scores, dropout prevention, ... school building construction," and school sports safety. *Id.* at 223. Indeed, in other New York communities during the 1960s and early 1970s, State education officials actively attempted to bring an end to the racial imbalance that existed in public schools in those communities. "The SED, under Commissioner Nyquist, did not hesitate to enforce the racial integration policy in connection with § 310 appeals from private citizens," *id.* at 225; and SED sometimes recommended action to correct racial imbalance in schools with respect to which no citizen had ever appealed, *see id.* The court thus found the State's arguments that SED lacked the power to intervene in Yonkers "singularly unpersuasive." *Id.* at 223. It concluded:

> The Court finds that the State had several effective means for compelling local compliance with its racial integration policy during the years at issue in this litigation. If the State did not in fact force compliance, it certainly was not because it lacked the authority or practical power to do so.

*Id.*

Instead, the State defendants did nothing to remedy school segregation in Yonkers, using none of their powers or authority toward that end. "From the moment in the late 1960's that the State became aware that conditions of racial imbalance were developing in the Yonkers schools, it was in a position to require Yonkers to undertake remedial measures," but "[i]t never took advantage of that position." *Id.*

> Rather than act, the State waited. It waited for private citizens in Yonkers to invoke the State's help by filing § 310 petitions, ... but no petition was ever filed. It waited for Yonkers to make voluntary efforts to desegregate its schools, and asserts that it stood ready with offers of money and technical assistance to aid such efforts.... But it never forced the issue. When, for example, the Yonkers education community appeared ready in 1970–71 to take steps to end the segregation in the schools, ... the SED dis-

patched staff member Morton Sobel to talk to the local PTA groups. Sobel's message was relatively soft: Yonkers is a segregated district; segregation is not good for children; it is up to you to do something about the condition in your schools.... When Yonkers did nothing about the condition in its schools, the State dropped the issue.

*Yonkers V,* 880 F.Supp. at 223–24. "The State did not, in short, require anything of Yonkers in the area of school desegregation." *Id.* at 223. While proclaiming a willingness to help Yonkers if Yonkers were to choose to desegregate voluntarily, the State decided that "it would not force Yonkers to change." *Id.* at 224.

In addition to refusing to act to end segregation in Yonkers, the State took certain actions that had the effect of encouraging that segregation. While noting that there was no evidence that SED officials affirmatively took steps intending to preserve Yonkers school segregation or to impede Yonkers itself from eliminating it, or that they indicated to anyone in Yonkers that they approved of that segregation or would "look the other way" should Yonkers decide to continue that segregation, and noting that there was no evidence that if a Yonkers citizen had filed a desegregation § 310 petition the Commissioner would not have responded to that petition promptly and fairly, the court found, *inter alia,* that the Board of Regents itself took actions that were, and were recognized to be, designed to cut back on school desegregation. For example, in two § 310 proceedings brought by SED Commissioner Nyquist, individual Regents interceded, urging that the Commissioner not enter drastic desegregation orders. Moreover, as a body, the Regents sought to "rein in Nyquist's desegregation efforts, ... [by] lobb[ying] for legislation providing for stricter judicial review of the Commissioner's § 310 orders." *Yonkers V,* 880 F.Supp. at 226. Further, in 1974, the Regents revised their policy statement on segregation so as to "dilute[ ] [its] pro-desegregation force." *Id.* at 225. Finally, in November 1976, the Regents fired Nyquist.

The reasons for the State defendants' actions and inactions, the district court found, were that those defendants were responding to pressures by New York State officials and constituents who opposed desegregation on grounds that were known to be race-based.

By 1969, ... opposition to non-voluntary means to achieve racial integration in the schools—and to racial integration itself— had swelled to the point where *the New York State Legislature enacted* Chapter 342, *a law that prohibited State education officials, as well as local school districts with appointed school boards, from assigning students for the purpose of achieving racial balance or of taking other desegregative actions.* Although the statute was ultimately declared unconstitutional, as violative of the Equal Protection Clause, ... *the attitude of the State Legislature was clear.* Indeed, even after Chapter 342 was struck down, the Legislature continued to debate and pass bills and resolutions that were similar to Chapter 342 in their purpose and intended effect....

*Following the invalidation of Chapter 342, the State took measures that had the cumulative effect of undermining efforts to reduce school segregation.* In 1971, the Legislature eliminated the Racial Balance Fund, which was the source of funding to assist communities in undertaking the expensive task of desegregating their schools, and refused each year thereafter to reinstate the Fund despite annual requests to do so from State education officials. The elimination of the Fund deprived State officials of one of the few positive inducements they had to encourage local acts of desegregation, and thereby weakened their efforts to implement the Regents' racial integration policy....

Changes were also taking place in the composition of the Board of Regents due to the accession to the Board of new Regents, interviewed prior to appointment by legislators (a new practice), who were known to be hostile to vigorous desegregation efforts.

*Yonkers V,* 880 F.Supp. at 225 (emphases added). In 1974, the State legislature passed a law shortening the Regents' terms of office

"in order to make them more 'accountable' to elected officials and their constituents." *Id.* Further, the court found that the Regents, in revising their policy statement on segregation in a way that "diluted [its] pro-desegregation force," were "prodded by criticism of Commissioner Nyquist's vigorous desegregation efforts." *Id.* As for their firing of Nyquist, "[h]is views on [integration] were a substantial factor leading to his discharge." *Id.* at 226.

The district court found that the "determined reluctance" on the part of the State "to enforce its own desegregation policy in Yonkers," *id.* at 224, resulted chiefly from that fact that "race-based political opposition to integration throughout New York State eventually exerted enough pressure on the Regents and on SED officials as to cause them to become cautious and reactive on the issue of desegregation." *Id.* at 224–25. "These pressures can only be explained in racial terms." *Id.* at 245. In summary, the district court found that

> the State had the power to act in support of school desegregation in Yonkers, but it lost the will to act. And it lost the will to act for the simple reason that its once touted principles of racial equality in the schools had become politically untenable.

*Id.* at 227. The court found "that the State's gradual retrenchment from its once strong school desegregation policy, as just outlined, was motivated by a growing antipathy to desegregation on the part of the New York State Legislature." *Id.* at 226.

The district court found that the State's acts and omissions "impacted the City in several ways." *Id.* at 227. The most obvious way was that "Yonkers was not forced to desegregate its schools. There is every reason to believe that had the State brought its coercive powers to bear in Yonkers, Yonkers would have complied with its directions." *Id.* In addition, the State's stance "altered the balance of power between the forces in Yonkers favoring reform and the forces in Yonkers opposing reform." *Id.* For example, when SED staff member Morton Sobel visited Yonkers in the early 1970s, bringing PTA groups merely the "tepid" message that segregation is not good for children and that

something should be done about it, opponents of desegregation " 'were delighted that they didn't have to deal with the issue [of desegregation], that it seemed as though it wasn't imperative.' " *Id.* (quoting testimony of Yonkers PTA member (modification in *Yonkers V* )). As another example, in 1975, SED promised $80,000 in funding to a task force authorized by the Board to develop a plan for desegregating the Yonkers schools; but SED proceeded to delay in providing any funding and then ultimately provided only $13,000. SED's conduct hindered the task force's efforts and "enabled opposition to the reform efforts to coalesce to the point where the [Board itself] became hostile to the very desegregation initiative it had originally commissioned." *Id.*

Further, "there was a public perception in Yonkers that Commissioner Nyquist's termination came as a result of his pro-integration stance. This perception added to the widespread belief that the State would not aggressively address the problems in the Yonkers schools or elsewhere in New York. And, whether accurate or not, this belief bolstered those in Yonkers who hoped that the State would in fact leave Yonkers alone." *Id.* at 228. Thus, one group, opposing a 1978 desegregation proposal by the then-superintendent of Yonkers schools, urged rejection of that proposal " 'without being intimidate[d] by fear of federal or state agency sanctions' " because

> "[t]he State Department of Education .... after going through a period marked by particularly zealous integration directives, is modifying its approach. Last spring, the former commissioner of education Ewald Nyquist, was dismissed because of his single[-]minded pursuit of desegregation throughout the state by busing and other means whether or not warranted. It is now obvious that the Board of Regents is taking a more cautions view of integration cases and directives."

*Id.* at 227–28 (quoting Report of Taxpayers Organization of Northeast Yonkers, dated March 5, 1978, at 4). The State officials and the Board of Regents made "no serious effort" to dispel the public perception, of which they were aware, that the State would not

force Yonkers to desegregate, *Yonkers V,* 880 F.Supp. at 228 n. 16.

"Thus it occurred that in Yonkers, where local support for desegregation was minimal and no citizen-initiated ... proceeding was ever commenced, desegregation simply did not take place until it was compelled by order of the federal court." *Id.* at 224.

### 2. *The District Court's Findings With Regard to Housing*

The district court found that the State also had knowledge that site selection for new subsidized family housing in Yonkers exacerbated segregative conditions both in housing and in the schools. The court found that, like the State, though UDC had the power to take steps to alleviate the housing segregation, UDC failed to do so, and instead worsened segregation by knowingly bowing to political pressure that it knew was race-based.

UDC, "[c]ombining functions, such as housing finance and project development, that were formerly performed by separate entities," "was perhaps the most powerful state housing and development agency ever created." *Yonkers V,* 880 F.Supp. at 228. It had "the unprecedented authority to override local building and land use controls and to exercise powers of eminent domain." *Id.* Nonetheless, though it had these powers and was staffed with "enthusiastic and idealistic persons," who were, "initially," "dedicated to the creation of fair housing" at sites scattered throughout Yonkers, *id.,* "UDC was soon made aware of strong local opposition to the building of subsidized housing in the predominantly white areas outside of Southwest Yonkers," *id.,* and it capitulated to that opposition while "clearly ha[ving] at least some knowledge that this opposition was race-based," *id.* "[C]onfronted with this race-based community opposition and concerned about the political feasibility of scattered-site housing, [UDC] made a determination not to exercise its statutory override powers, which would have enabled it to proceed without local approval." *Id.* Thus, "between 1969 and 1975 the UDC, regardless of its long-term plans or good intentions, knowingly acquiesced and indeed participated in

the segregative site selections." *Id.* at 229. UDC consequently "worsened the already segregated state of housing and schools in the City." *Id.* "[A]t least some SED staff knew during the mid-to-late 1970's that Yonkers was planning to build subsidized housing in a way that would enhance segregation." *Id.* at 244 n. 37.

### 3. *The District Court's Conclusions of Law*

Notwithstanding the above findings, the district court, "with reluctance," *Yonkers V,* 880 F.Supp. at 245, concluded that plaintiffs' claims against the State officials under § 1983 must be dismissed on the basis of this Court's opinion in *Arthur v. Nyquist,* 573 F.2d 134 (*"Arthur"*). The district court construed *Arthur* to mean that "a state's knowing failure to meet its obligation to eradicate segregation is insufficient to impose liability on the state," *Yonkers V,* 880 F.Supp. at 234; that "more than knowledge of wrongdoing and the power to end it is required before § 1983 liability can be imposed on a state," *id.* at 236; that "state officials cannot be held liable for their mere inaction or failure to combat the segregative acts of local officials," *id.* at 244; and that, "abdication by the state in discharge of its duty to cause local districts to desegregate does not afford a basis for liability," *id.* at 245. Under this interpretation, the district court ruled that a finding of State liability was foreclosed by *Arthur:*

> [I]t is a close and difficult question whether the issues before this Court are qualitatively different from those dealt with by the Court of Appeals in *Arthur v. Nyquist.* The *Arthur* Court acknowledged the power that resided in the state educational authorities to deal with segregation in Buffalo and accepted the proposition that, "given the chosen policies of the state appellants, it was [not] unforeseeable that the Buffalo schools might remain segregated for an extended period of time." 573 F.2d at 146. But, the *Arthur* Court tells us, more than knowledge of wrongdoing and the power to end it is required before § 1983 liability can be imposed on a state. What else is required? If it can be shown that state and local authorities conspired to

thwart state desegregation policies, the result would be different. If it can be shown that state officials gave local authorities *specific* approval, and thereby support, of their unlawful conduct, the result would be different. But the *Arthur* Court searched the record in vain for evidence of such complicity and approval, and we have engaged in a like inquiry, with like results.... The closest one approaches to approval is, in our opinion, the determination by the Commissioner and his staff not to recommend to the Legislature that funding proposals for the benefit of local school communities be made contingent on adoption of desegregation programs. But the reason advanced was a concern that the legislation would fail in its entirety, not a desire to perpetuate segregation.

Indeed, there is no evidence of any affirmative pro-segregative action on the part of the State. The reining in of Commissioner Nyquist and the adoption of less aggressive integration statements over the course of the 1970's are compelling evidence that the State's policy with respect to local segregation grew increasingly passive and reactive, but the policy cannot fairly be categorized as being affirmatively in favor of segregation. State permissiveness and, in truth, state hypocrisy in the face of local segregation are not automatically tantamount to state encouragement and/or authorization of segregation. *See Arthur,* 573 F.2d at 146. That anti-desegregation groups in Yonkers tried to find in the State's permissiveness signs of actual, positive support for their position says something about the political forces at work in Yonkers; but it does not without more transform the State's failure to intervene in Yonkers into affirmative support of school segregation in Yonkers, from a legal standpoint....

Since we are unable to find, after an exhaustive inquiry, conduct on the part of the State which would satisfactorily distinguish this case from *Arthur v. Nyquist,* and since th[at] case ... is controlling on this Court, we answer in the negative the question of whether the State may be held liable for knowingly tolerating, *i.e.,* for not proceeding aggressively against, the *de*

*jure* segregation that existed in the Yonkers schools.

*Yonkers V,* 880 F.Supp. at 236 (emphasis and modification in original).

Thus, although having found (a) that the State had the power to take action against school segregation in Yonkers that it knew or should have known was *de jure,* (b) that that school segregation was perpetuated by the conduct of the State that encouraged the opponents of desegregation, and (c) that the State conducted itself as it did because of pressures it knew to be racially motivated, the court nonetheless concluded that plaintiffs' § 1983 claims must be dismissed because the court believed itself "constrained by the decisional rule set forth in *Arthur,*" *Yonkers V,* 880 F.Supp. at 245:

> We reach this conclusion with reluctance for several reasons.
>
> First, we find entirely unpersuasive the argument of the State that it lacked full knowledge of the nature, cause and extent of the segregation in the Yonkers public schools....
>
> We find similarly unpersuasive the State's contention that it lacked the power to address adequately the problem of school segregation. There is no doubt in our mind that the State possessed the full means and authority needed to deal with Yonkers school segregation, had it been inclined to do so. We conclude that the State determined not to take any affirmative action to deal with Yonkers school segregation because of political and other pressures, from within the Board of Regents and from without, which opposed vigorous desegregation efforts. These pressures can only be explained in racial terms.
>
> However, we find no basis for imposing liability on the State because we find ourselves constrained by the decisional rule set forth in *Arthur v. Nyquist.* As have we, the court in *Arthur* found that the state had the power and duty to address segregation (there, in Buffalo), but nevertheless held that the absence of affirmative participation by the state in local pro-segregative conduct compelled a finding of no-

liability. The teaching of *Arthur* is that abdication by the state in discharge of its duty to cause local districts to desegregate does not afford a basis for liability....

In the end, we conclude that the differences between this case and *Arthur* are quantitative, not qualitative. The extent of the State's determination *not* to act vis-a-vis school desegregation in Yonkers and the consequences of that inaction have been fully documented; but no more has been shown.

*Yonkers V,* 880 F.Supp. at 245 (emphasis in original).

The court reached the same conclusion with respect to the § 1983 claims against the State officials for housing segregation. It concluded that, notwithstanding the fact that the State education officials knew that the City's housing practices were segregative, knew of UDC's participation in the segregative housing site selections, and knew that those site selections exacerbated segregation in the schools, the State's conduct was not actionable under the court's interpretation of *Arthur. See Yonkers V,* 880 F.Supp. at 244–45.

As to the claims against UDC, the court found them time-barred. The court found that plaintiffs, who did not seek to make UDC a defendant until 1987, knew or should have known of UDC's role no later than 1975, and that these claims were therefore barred by the three-year statute of limitations. The court rejected plaintiffs' contention that UDC's failure to remedy the vestiges of unlawful segregation should be viewed as a "continuing wrong," *id.* at 242, reasoning that UDC, whose participation in any housing program in Yonkers ended in 1975, *see id.* at 229, had no "ongoing, pervasive role in matters directly affecting school attendance zoning," *id.* at 243:

> [T]here is no authority for applying a "continuing wrong" theory to the housing defendants here. Although the courts have held some governmental entities to have an affirmative duty to take steps to eliminate the effects of past school segregation and have found a failure to take these steps to be a continuing violation of the affirmative duty, ... this doctrine

seems to have been limited only to defendants with an ongoing, pervasive role in matters directly affecting school attendance zoning.... The rationale for finding a continuing wrong by school authorities in these cases is that every assignment by school authorities of a minority student to a minority school is a new discriminatory act.... As defendants point out, "[t]here is no evidence, however, that UDC had such power over schools, students, or attendance lines, or assisted the Board in its exercise of such powers.".... Therefore, since the UDC's activities in Yonkers took place within a finite time interval and ceased entirely in 1975, this suit, commenced in 1987, cannot be maintained. We accordingly dismiss the claims against the UDC and its present director.

*Id.* at 242–43.

The district court also ruled that the actions of UDC could not be imputed to the State. It found that UDC, "an entity distinct and separate from the State" with "substantial operational autonomy," is not "an arm or an instrumentality of the State," *id.* at 243; and it stated that there was no evidence that State officials and UDC had worked together in a concerted manner in pursuit of a common segregative goal.

### C. Yonkers VI: *Dismissal of the Title VI and EEOA Claims*

In a subsequent opinion, *Yonkers VI,* the district court ruled that the State defendants also were not liable under Title VI or the EEOA.

Influenced by its reading of *Arthur,* the court rejected plaintiffs' claims under Title VI on the ground that the court had not found that the State defendants themselves had engaged in purposeful discrimination. "In this case, acts of intentional racial discrimination have undoubtedly been found, but they have been found only on the part of local Yonkers officials, not on the part of the State defendants." *Yonkers VI,* 888 F.Supp. at 597. Stating that "a state no more 'intentionally' fosters racial segregation by failing to prevent local acts of intentional segregation than it 'intentionally' fosters racial seg-

regation by failing to alter adventitious housing patterns—in other words, it does not unconstitutionally discriminate in either instance," the court concluded that the State's "failure to prevent local acts of segregation, without more," did not violate Title VI. *Yonkers VI*, 888 F.Supp. at 597.

The district court ruled that the application of the EEOA to the State would be inappropriate because the decade-old court-ordered remedial plan had been entered without findings mandated by that statute. Stating that Congress's intent in enacting the EEOA was to "ensure that courts impose certain vigorous remedies (such as the compulsory transportation of students) only as a last resort, after due and explicit consideration of more moderate alternatives," the court noted that its remedial plan included, "albeit to a minimal degree," mandatory busing which then-parties had assumed was necessary, and that the court had not "made (nor [been] requested to make) specific findings regarding the efficacy of remedies other than busing." *Yonkers VI*, 888 F.Supp. at 595. The court concluded that holding the State liable under the EEOA would make the State a party to a busing order, that that result was inappropriate without the findings required by the EEOA, and that it was too late to reopen proceedings for the consideration of alternative remedial plans:

> We do not think it would be consistent with Congress' intent in adopting the EEOA to require the State to participate in a remedial plan that does not comport with the requirements of a statute applied retroactively to it. Nor do we think it would be sound, from any perspective, to reopen at this late stage in these proceedings questions relating to the proper scope of a remedial plan adopted and implemented a decade ago. Regardless of whether the State can be held vicariously liable as a matter of law under section 204 of the EEOA, we conclude that it cannot lawfully be made to participate in the remedial plan now in place in Yonkers. The State therefore cannot be held accountable under the EEOA in this case.

*Yonkers VI*, 888 F.Supp. at 595.

The court ordered the entry of a final judgment pursuant to Fed.R.Civ.P. 54(b) re-flecting the *Yonkers V* and *Yonkers VI* dismissals of plaintiffs' claims against the State defendants and UDC, and this appeal followed.

## II. DISCUSSION

On appeal, plaintiffs contend that they are entitled to a ruling that the State and UDC are liable for the vestiges of school segregation, given the district court's findings of fact. They contend that those findings distinguish the present case from *Arthur v. Nyquist*. The State and UDC contend principally that the district court correctly concluded that plaintiffs' claims against them are precluded by *Arthur*; they make few challenges to the court's factual findings. We have considered all of appellees' arguments on this appeal and conclude that the judgment of the district court cannot stand. For the reasons that follow, we conclude that the district court's findings of fact are supported by the evidence, and that those findings distinguish this case from *Arthur* and warrant the imposition of liability.

### A. *The Equal Protection Claims and Arthur*

██ The fundamental principles governing equal protection claims are well established. They were thoroughly discussed in *Yonkers III*, 837 F.2d at 1216–18, 1221–27, and do not require extended discussion here. A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with intent to discriminate. *See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) ("*Arlington Heights I*"); *Keyes v. School District No. 1*, 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973). *See generally Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The plaintiff need not show, however, that a government decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial, for

"[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."

*Arlington Heights I,* 429 U.S. at 265, 97 S.Ct. at 563 (footnote omitted). Rather, the plaintiff need begin only by showing that race was "*a* motivating factor." *Id.* at 266, 97 S.Ct. at 563–64 (emphasis added). Once it is shown that a decision was motivated at least in part by a racially discriminatory purpose, the burden shifts to the defendant to show that the same result would have been reached even without consideration of race. *Id.* at 270 n. 21, 97 S.Ct. at 566 n. 21; *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If the defendant comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established.

*Yonkers III,* 837 F.2d at 1217. *See also Arthur,* 573 F.2d at 142 ("A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." (internal quotation marks omitted)).

■ The requisite intent element may be established in a number of ways. "The foreseeability of a segregative effect, or 'adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance,' is a factor that may be taken into account in determining whether acts were undertaken with segregative intent." *Yonkers III,* 837 F.2d at 1227 (quoting *Columbus Board of Education v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979) (other internal quotation marks and modification omitted)); *see also Hart v. Community*

*School Board of Education,* 512 F.2d 37, 46–48, 51 (2d Cir.1975); *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 183–84 (6th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Other probative sources may include "[d]epartures from the normal procedural sequence," *Arlington Heights I,* 429 U.S. at 267, 97 S.Ct. at 564, "[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *id.,* and patterns of official appointments that fill key positions with persons who are likely to maintain a segregated status quo, *see Yonkers III,* 837 F.2d at 1235.

In *Yonkers III,* we concluded that the forbidden segregative intent was established where governmental defendants took actions in response to and in accordance with community pressures that they knew were racially motivated:

Even assuming ... that the actions of the municipal officials are only responsive rather than leading the fight against desegregation, we conclude that the Equal Protection Clause does not permit such actions where racial animus is a significant factor in the community position to which the city is responding....

*Id.* at 1224 (citing, *inter alia, Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984)). We noted that

[t]he Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens.... [In *Palmore v. Sidoti* ], the Court stated as follows: "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.'" 466 U.S. at 433, 104 S.Ct. at 1882 (quoting *Palmer v. Thompson,* 403 U.S. 217, 260–61, 91 S.Ct.

1940, 1962, 29 L.Ed.2d 438 (1971) (White, J., dissenting)).

*Yonkers III,* 837 F.2d at 1224. We cited with approval cases such as *Smith v. Town of Clarkton,* 682 F.2d 1055, 1063–66 (4th Cir. 1982), in which

> a town was found liable under the Equal Protection Clause [*inter alia* ] for withdrawing from a joint plan to construct low-income housing, where its withdrawal was a response to town residents' opposition that was "motivated in significant part by racial considerations." 682 F.2d at 1063.... *Though there was no evidence that the town officials themselves had a history of racially discriminatory acts or that in their individual capacities they were racially motivated,* the circuit court upheld the imposition of liability, stating that "[i]t is not necessary, in proving a violation of the equal protection clause, to show that the challenged actions rested *solely* on a racially-discriminatory intent in order to demonstrate that the involved officials acted with an intent to illegally discriminate," *id.* at 1066 (emphasis in original), and concluding that *there could be "no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition," id.*

*Yonkers III,* 837 F.2d at 1225 (emphases added except as indicated). We concluded that

> [i]t is sufficient to sustain a racial discrimination claim if it has been found, and there is evidence to support the finding, that racial animus was a significant factor in the position taken by the persons to whose position the official decision-maker is knowingly responsive.

*Id.* at 1226; *see also id.* ("City may properly be held liable for the segregative effects of a decision to cater to [the race-based] 'will of the people' "); *id.* at 1234 ("To the extent that the Board was being responsive to the wishes of segments of the community and the [City] Council, the imposition of liability on the Board was proper since the opposition to desegregative steps was racially motivated.").

Liability may be premised not only on action but on a refusal to act. *See, e.g., Arthur,* 573 F.2d at 141 (a finding of *de jure* segregation may be based on acts of commission or omission by governmental bodies which have the " 'natural and foreseeable consequence of causing educational segregation' " (quoting *Hart v. Community School Board of Education,* 512 F.2d at 50)). Thus, "[g]overnment officials may be held liable under § 1983 for a failure to do what is required." *Doe v. New York City Department of Social Services,* 649 F.2d 134, 141 (2d Cir.1981), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). *See also Duchesne v. Sugarman,* 566 F.2d 817, 832 (2d Cir.1977) ("[w]here conduct of the supervisory authority is directly related to the denial of a constitutional right it is not to be distinguished, as a matter of causation, upon whether it was action or inaction"). Further, in *Comer v. Cisneros,* 37 F.3d 775 (2d Cir. 1994), we considered a claim that the commissioner of New York's Division of Housing and Community Renewal had improperly failed to use his authority to intervene in a municipal housing authority's operations to assure protection of state and federal civil rights. We observed *obiter* that "[i]f [the commissioner] did have authority to intervene, and he knew about the discriminatory practices in the tenant selection process, then he could be liable under 42 U.S.C. § 1983." *Comer v. Cisneros,* 37 F.3d at 804. Even if an official had no statutory duty to act, he may be liable if his refusal to act was a response to pressures that were known to be racially motivated. *See, e.g., Yonkers III,* 837 F.2d at 1218–19 (where site restrictions on low-income housing were imposed in response to pressures known to be racially motivated, the fact that the City had no duty to provide low-income housing was not significant); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) (housing restrictions with religious motivation), *cert. denied,* —— U.S. ——, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996).

These principles govern the present case, for though the district court stated that it did not find that the State officials and UDC themselves performed affirmative acts of intentional discrimination, it found that the

**614**

State knew of the segregation in Yonkers, had actual or constructive knowledge that the segregation was *de jure,* had the power to take steps to remedy that segregation, and refused to exercise that power because they were capitulating to political pressures that they knew were racially motivated. In detail, the district court found, *inter alia,* that

—the State was aware of circumstances that should have alerted it to Yonkers's unlawful segregation of its schools, and "if in fact the State defendants were not so alerted, it was because they themselves chose to remain ignorant" "in the face of actual conflicting evidence,"

*Yonkers V,* 880 F.Supp. at 219, 220;

—the State had "actual or constructive[ ] knowledge of illegal racial segregation in the Yonkers public schools,"

*id.* at 220;

—the State had "full knowledge of the nature, cause and extent of the segregation in the Yonkers public schools,"

*id.* at 245;

—the State "knew that Yonkers," "if left to its own devices, was not going to remedy the segregation voluntarily,"

*id.* at 219, 220. The court also found, *inter alia,*

—that in other communities, Commissioner Nyquist had "not hesitate[d] to enforce the [New York] racial integration policy,"

*id.* at 225;

—that the legislature responded to Nyquist's desegregation efforts with a statute that "prohibited State education officials, as well as local school districts with appointed school boards, from assigning students for the purpose of achieving racial balance or of taking other desegregative actions,"

*id.*;

—that, after that statute was declared unconstitutional, the legislature took other actions whose "purpose and intended effect" were "similar" and "had the cumula-

tive effect of undermining efforts to reduce school segregation,"

*id.*;

—that the legislature also adopted "a new practice" of having candidates for the Board of Regents be "interviewed prior to appointment by legislators ... who were known to be hostile to vigorous desegregation efforts,"

*id.*;

—that the Regents revised their policy statement on segregation so as to "dilute[ ] [its] pro-desegregation force,"

*id.*;

—that this revision was a response to "criticism of Commissioner Nyquist's vigorous desegregation efforts,"

*id.*;

—that the Board of Regents lobbied for legislation providing for stricter judicial review of the Commissioner's § 310 orders in an effort to "rein in Nyquist's desegregation efforts,"

*id.* at 226; and

—that the Board of Regents finally simply fired Nyquist; "[h]is views on [integration] were a substantial factor leading to his discharge,"

*id.*

Thus, the district court found that the State had exhibited a "determined reluctance to enforce its own desegregation policy in Yonkers," *id.* at 224; that the State decided that "it would not force Yonkers to change," *id.*; and that that determined reluctance was a knowing response to increasing "opposition ... to racial integration," *id.* at 225. In sum, the State determined not to take any affirmative action to deal with Yonkers school segregation because of political and other pressures, from within the Board of Regents and from without, which opposed vigorous desegregation efforts. These pressures can only be explained in racial terms.

*Id.* at 245.

Of these findings, the State has challenged only the finding that the State defendants knew or reasonably should have known that the segregation in Yonkers was *de jure*

rather than *de facto.* We reject this challenge. The evidence before the district court included many SED documents and the testimony of several former SED officials, including Sobel, whose title was "Specialist in Educational Integration" and whose primary function related to racial imbalance and desegregation activities in local school districts. Documentary evidence revealed that SED had begun collecting annual statistics in 1966 with regard to the racial makeup of each school district as a whole and of each school within the district. Sobel, who joined SED in 1968, testified, "We had figures which were reported by every school district annually, including racial breakdown of student body and professional staff and so on." (Deposition of Sobel at 176.) With respect to Yonkers, Sobel said, "[A]ll I had to do was to look at the numbers and see that there was racial imbalance existing." (*Id.*)

Sobel visited the schools in Yonkers and was aware that the predominantly minority schools tended to have worse physical plants, less recreation space, and more minority teachers, who tended to be less experienced than the teachers at predominantly white schools. (*See id.* at 257–58.) He testified, "I was in a district that was not integrated" (*id.* at 258–59), and that the minority schools were inferior.

SED also received letters and telephone calls from Yonkers residents "complain[ing] about predominantly or all minority schools." (*Id.* at 179.) Sobel testified, "we also had the figures so we knew what the situation was." (*Id.* at 178.) In 1968, for example, an SED official wrote to a Yonkers resident offering reassurance that SED was "working toward a reduction of racial imbalance" in the Yonkers schools. (Letter of Wilbur R. Nordos, assistant to SED Commissioner Allen, to Ruth Love, dated February 27, 1968.)

In early 1970, Nyquist wrote to the Yonkers Board of Education, pointing out that the October 1969 school racial census revealed that "your school district has a district-wide average of 13.1% minority group students. It further shows that of the 40 schools, 24 are at 10% or greater variance from the district-wide average, the greatest variance being 65% or more." (Letter of Commissioner Ny-

quist to President of the Yonkers Board of Education at 1.) Nyquist asked the Board to respond by July 1970 with proposals for desegregation.

Though there was an initial brief response to Nyquist's letter, the Yonkers school superintendent died in September 1970, and Sobel thereafter viewed it as highly unlikely that the Board would proceed with any steps toward desegregation voluntarily. His view was not based on conjecture or surmise. School administrators told Sobel that there was community opposition to desegregation of the schools in Yonkers (*see* Deposition of Sobel at 259), and the acting superintendent told Sobel explicitly "that he [the acting superintendent] was not going to do anything. He said that very clearly" (*id.* at 122). One of the reasons stated by the acting superintendent for declining to take any action was that "if he [the acting superintendent] did move ahead in the area of desegregation, since he was a candidate for the superintendency it was his feeling that community resistance might impede his candidacy." (*Id.* at 122–23.) There was "absolutely[ ] no question" in Sobel's mind that the acting superintendent was correct, that if he took steps toward desegregation he "would encounter vocal opposition." (*Id.* at 126–27.)

Though often the local opposition to any SED offer of help was stated in terms of opposition to busing, Sobel testified that, in his experience, a stated "opposition to busing was a smoke screen for their opposition to racial integration.... [T]hose who opposed busing for desegregation purposes used that to support their opposition to racial integration. I never heard any of those people object to transporting children for other reasons." (*Id.* at 84.) Sobel's view was amply supported by, *inter alia,* the evidence presented at the first trial in this litigation; in *Yonkers III,* we noted that any suggestion that "popular opposition to desegregative proposals was merely an opposition to busing, not to desegregation," was "entirely frivolous," 837 F.2d at 1231, given the fact that "[h]ostile white audiences from at least the early 1970's ... told state and local school officials *in haec verba* that they did not want their children going to school with minority

children," *id.* In light of the local opposition to desegregation, Sobel "was convinced that Yonkers was not going to move forward on its own" (Deposition of Sobel at 306), and he expected that it would not ask SED for help. His expectations were borne out. It was Sobel's view from September 1970 until he left SED in 1980, that Yonkers school officials were in default on their responsibilities to carry out the educational policies of New York State with respect to racial imbalance (*see id.* at 354–55), "that ... Yonkers had serious problems with racial imbalance" (*id.* at 304), and "that the racial imbalance in Yonkers was getting worse" (*id.* at 292). By January 1976, data collected and analyzed by SED made it "evident that Yonkers was one of the most segregated school districts in the State of New York." (Deposition of former SED official Stanley C. Campbell at 72).

In sum, the record evidence amply supports the district court's finding that the State defendants had full knowledge of the nature, cause, and extent of the segregation in the Yonkers schools, and that they knew or should have known that the school segregation in Yonkers was *de jure.*

Further, there was ample support, and the State defendants do not appear to contend otherwise, for the court's finding that the failure of the SED officials to take action toward desegregation in Yonkers, though they took remedial action in other cities, was the result of heavy pressure from the New York State legislature. Sobel testified, for example, that the perception in SED was that the New York Senate majority leader, who represented Niagara Falls, expressed doubts about continuing the legislative appropriation for SED's "Racial Balance Fund," which was used to help districts desegregate, because the majority leader opposed SED's racial balance plan for Niagara Falls. SED officials' view was that the senator "might decide to punish us" in order to curry favor with his constituents. (Deposition of Sobel at 383.) The legislature did thereafter stop making Racial Balance Fund appropriations.

The evidence also included the testimony of former Regent Theodore M. Black that in the early 1970s, state legislators took several steps to control the Board of Regents' efforts toward desegregation. Realizing that Nyquist served at the pleasure of the Board of Regents without a contract, the legislative leadership intensified its efforts to accelerate changes in that board's membership, shortening the Regents' term of office from 15 years to seven. Further, in about 1973, individual legislators began to interview candidates for Regent positions and in the interviews discussed the subject of busing; at least one Regent whose term was about to expire was very much in favor of busing, and he was not reappointed; an on-the-record opponent of busing was appointed instead. Black testified:

> It was not difficult to divine what the legislature was up to. They kept up the pressure on the Regents for two reasons: to hasten abandonment of the Regents['] pro-busing policy, and to hasten the dismissal of the commissioner who was blamed for it.

(Deposition of Black at 100.)

The legislature also cut SED appropriations. As Black characterized it, "If the Regents wouldn't give ... Nyquist the sack, then the legislators would use their favorite weapon, money, to hack his top staff to pieces. It was a cruel time." (*Id.* at 132.)

Former Regent Kenneth Clark testified similarly that

> in the '70s, middle or late '70s, it became more and more clear that the legislature was moving toward restricting the activities of the Regents and the State Education Department in the area of desegregation of schools. Very strong and clear signals started to come that the legislature, probably responding to their clients [*sic*], were against busing, were against a continued aggressive approach to desegregation on the part of the Board of Regents.

(Deposition of Clark at 14.) He elaborated that

> the most obvious [signal] was that the legislature, in seeking to determine who would or would not be elected to the Board, would have interviews with prospective members or with those members of the Board of Regents whose term had

come up and who were to be re-elected; that the interviews seemed clearly related to the litmus test of determining whether the prospective regent or the regent to be re-elected was or was not supportive of the legislature's position on anti-busing and desegregation. This was clear. And there was no question that the legislature was becoming more and more aggressive in blocking the school integration that was being pursued earlier by the Board of Regents.

. . . .

. . . [E]veryone knew . . . that the legislature, in exercising its power to select Regents, was also at the same time sending the signal that the Commissioner of Education at the time, Ewald Nyquist, was to be restrained in his powers as far as integration is concerned.

(*Id.* at 14–15, 22–23.)

The district court's amply supported factual findings distinguish the present case from *Arthur v. Nyquist* in at least two critical respects. First, with respect to Buffalo, the state officials took numerous steps in an attempt to have that city develop an effective desegregation plan. When the Commissioner found that *de facto* segregation existed in Buffalo, he ordered that city's board of education to submit a desegregation plan within three months; when he found the submitted plan to be inadequate, he rejected it and required a new plan; he appointed an advisory committee to help develop a satisfactory plan; when a satisfactory plan was eventually submitted, he approved it and ordered periodic reports on its implementation. When the approved plan was thwarted by the Buffalo city council's refusal to appropriate funds for it, the Commissioner, *inter alia*, ordered the school board to submit a new desegregation plan, and he sent members of his staff to Buffalo to work with the board. When all of those efforts failed, the Commissioner issued a show-cause order to the Buffalo board, threatening to exercise his statutory enforcement powers. Second, although we noted in *Arthur* that the state officials could have taken more drastic action, and that absent such action it was "[n]o[t] . . . unforeseeable that the Buffalo schools might remain segregated for an extended period of time," 573 F.2d at 146, we concluded that the state officials had rebutted any inference of segregative intent arising from that foreseeability because they showed "legitimate policy considerations [that] warranted" their decision not to use more drastic remedies, presenting legitimate bases for viewing harsher measures as "inappropriate under the circumstances," *id.* We concluded that there was insufficient evidence in *Arthur* that the state officials abdicated their duties to attempt to achieve desegregation.

In sum, in *Arthur* there was evidence (a) that the state officials made substantial, repeated efforts to require Buffalo to develop and implement a desegregation plan, and (b) that the state officials' decision not to use more drastic measures was the result of legitimate considerations rather than of their capitulation to views they knew to be racially motivated. Thus, the evidence in *Arthur* as to SED's conduct and motivation with respect to Buffalo was materially different from the evidence in the present case with respect to Yonkers. *Arthur* did not warrant dismissal of the claims against the State for its conduct with respect to Yonkers.

Further, although the district court concluded in the present case that there was no evidence that SED officials ever gave "*specific* approval" to segregation in Yonkers, *Yonkers V,* 880 F.Supp. at 236 (emphasis in original), or intentionally took any "affirmative pro-segregative action," *id.,* and no evidence that the Board of Regents "was affirmatively in favor of segregation," *id.,* those conclusions are, in the circumstances here, not dispositive. The court permissibly found that the State acted in a way that had the effect of encouraging the perpetuation of *de jure* segregation and knew that through its actions and omissions it was capitulating to pressures that were racially motivated. This conduct falls squarely within the principles enunciated in *Yonkers III, see, e.g.,* 837 F.2d at 1224–26, 1232. Government officials, whether city or state, are not permitted to engage in deliberate conduct or deliberate omissions that have the foreseeable effect of perpetuating known segregation, where their acts or omissions are undertaken in response

to and in accordance with the segregative wishes of others that are known to be racially motivated. Thus, though the district court posited that "a state's knowing failure to meet its obligation to eradicate segregation is insufficient to impose liability on the state," *Yonkers V*, 880 F.Supp. at 234, that statement is elliptical. It is not correct where the failure was the result of a knowing capitulation to racially inspired pressures rather than of any legitimate reasons. In the present case, the district court found no legitimate reasons.

■ The State defendants contend, however, that the judgment in their favor should be upheld on the basis that, under New York law, they lacked legal authority or responsibility to intervene in Yonkers to remedy the unlawful segregation. In light of the express provisions of New York statutory law, this contention need not detain us long.

Under the New York Education Law, SED, with the Board of Regents as its "head," and the Commissioner as its "chief administrative officer," is "charged with the general management and supervision of all public schools." N.Y. Educ. Law § 101; *see also id.* § 305(2) (Commissioner has "general supervision over all schools"). At all times pertinent to this litigation, the statute has provided that *"[n]o person shall be refused admission into or be excluded from any public school in the state of New York on account of race...." Id.* § 3201(1) (emphasis added).

The statute provides that the Commissioner *"shall* enforce all general and special laws relating to the educational system of the state and execute all educational policies determined upon by the board of regents," *id.* § 305(1) (emphasis added); and it provides that he *"shall also have the power* and *it shall be his duty* to cause to be instituted such proceedings or processes as may be necessary to properly enforce and give effect to any provision in this chapter or in any other general or special law pertaining to the school system of the state or any part thereof or to any school district or city," *id.* § 308 (emphases added). *See also Arthur,* 573 F.2d at 146; *New York City School Boards Association v. Board of Education of the City School District of the City of New York,* 39 N.Y.2d 111, 116, 383 N.Y.S.2d 208, 211, 347 N.E.2d 568 (1976); *Vetere v. Allen,* 15 N.Y.2d 259, 267, 258 N.Y.S.2d 77, 80, 206 N.E.2d 174 (per curiam), *cert. denied,* 382 U.S. 825, 86 S.Ct. 60, 15 L.Ed.2d 71 (1965). In *Vetere,* the New York Court of Appeals noted that where the Commissioner and the Board of Regents find that racial imbalance in the schools of a given community has made the schools educationally inadequate, the Commissioner has virtually unreviewable authority under the Education Law to order student transfers in order to eliminate the imbalance.

Further, as the district court observed in the present case, the statute also gives the Commissioner various explicit powers that he may use in order to carry out his duty to enforce state educational laws and policies. *See, e.g.,* N.Y. Educ. Law § 306(2) (he may withhold state financial aid from any school district for willfully disobeying any law or order); *id.* § 310 (he may institute quasi-judicial proceedings); *id.* § 408 (he may withhold approval of purchase or building of new school facilities); *id.* § 306(1) (he may remove school board officials).

Given the statute's clear impositions of duty and grants of power, the State defendants' twin disclaimers of responsibility and authority are meritless.

In sum, in *Yonkers III*, we were left with no doubt that the City and Board officials knew of the racial animus motivating most of the opposition to school or housing desegregation in Yonkers. On the present appeal, in light of the record supporting the findings made in *Yonkers V*, there is also no doubt (1) that SED officials (a) were aware that citizen opposition to desegregation in Yonkers was motivated by racial animus, (b) were aware that the local officials would take no action to achieve desegregation voluntarily, and (c) were aware that the refusals of City and Board officials to take action toward desegregation were designed to placate that racial animus; and (2) that the State defendants failed to exercise their authority and failed to fulfill their responsibility to take steps to achieve desegregation in Yonkers, and instead took actions that encouraged the per-

petuation of segregation, because of their deference to the racially inspired positions of the local officials and the known anti-desegregation stance of other state officials.

As we said in *Yonkers III*, public officials may not, with impunity, give effect to private biases, either directly or indirectly. We conclude that, given the district court's amply supported findings of fact, the defendant State officials may properly be held liable under § 1983 on plaintiffs' claims for prospective injunctive relief to remedy vestiges of school segregation in Yonkers.

**B. *The EEOA Claims***

 To the extent that plaintiffs' claims were asserted against New York State, SED, and the Board of Regents, (collectively the "State institutional defendants"), the claims properly were not upheld under § 1983, for those defendants have Eleventh Amendment immunity and hence are not considered to be persons suable under § 1983. *See, e.g., Howlett v. Rose*, 496 U.S. 356, 365, 110 S.Ct. 2430, 2436–37, 110 L.Ed.2d 332 (1990); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). *But see Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 362–63, 116 L.Ed.2d 301 (1991) (an individual state official sued in his or her official capacity for injunctive relief is a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State" (internal quotation marks omitted)); *Will v. Michigan Dept. of State Police*, 491 U.S. at 71 n. 10, 109 S.Ct. at 2312 n. 10 (same). Nonetheless, plaintiffs were entitled to prevail against the State institutional defendants under the EEOA, which contains prohibitions directed expressly against the states and their agencies.

The EEOA (or the "Act") provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin." 20 U.S.C. § 1703 (emphasis added). Further, the Act forbids the state to perpetrate such a denial through various acts or omissions of an "educational agency." *See id.* §§ 1703(a)–(f). The Act defines "educational agency" as "a local educational agency *or* a 'State edu-

cational agency.'" *Id.* § 1720(a) (emphasis added); *see also Idaho Migrant Council v. Board of Education*, 647 F.2d 69, 71 (9th Cir.1981) (educational agency as used in EEOA includes a "state board of education"). It provides that the state may be held liable for, *inter alia,*

(c) *the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides,* if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

(d) *discrimination by an educational agency* on the basis of race, color, or national origin *in the employment, employment conditions, or assignment to schools of its faculty or staff....*

20 U.S.C. §§ 1703(c) and (d) (emphases added).

 The legislative history of the EEOA "is very sparse, indeed almost non-existent." *Castaneda v. Pickard*, 648 F.2d 989, 1001 (5th Cir.1981). The Act itself, however, in providing explicitly that "[n]o State" shall engage in the prohibited conduct and in including within the prohibition acts by "State educational agenc[ies]," obviously reflects Congress's intention to hold the states and their agencies liable. We thus view the EEOA as expressly abrogating the states' Eleventh Amendment immunity to the extent necessary to effectuate the purposes of the EEOA. *Accord Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1038 (7th Cir.1987) ("the EEOA expressly contemplates that relief is to be obtained from the state and its agencies"); *Board of Education of Peoria, School District No. 150 v. Illinois State Board of Education*, 810 F.2d 707, 712 (7th Cir.) (EEOA "requires that the *state* ensure compliance" (emphasis in original)), *cert. denied*, 484 U.S. 829, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987).

As a substantive matter, the EEOA provides protections similar to those provided by the Equal Protection Clause. In enacting the EEOA, Congress

> declare[d] it to be the policy of the United States that—
>
> > (1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and
> >
> > (2) the neighborhood is the appropriate basis for determining public school assignments.

20 U.S.C. § 1701(a). Congress's purpose was to "specify appropriate remedies for the orderly removal of the vestiges of the dual school system." *Id.* § 1701(b). Thus, the Act provides substantive protections that "considerabl[y] overlap ... those provided under the fourteenth amendment," *United States v. School District of Ferndale, Michigan,* 577 F.2d 1339, 1346 (6th Cir.1978); *see also Castaneda v. Pickard,* 648 F.2d at 1001 ("the elements of plaintiff's cause of action for discrimination in the hiring and promotion of teachers and administrators under the [EEOA] are the same as the elements of their claims premised on the fourteenth amendment and § 1983"); *United States v. Hinds County School Board,* 560 F.2d 619, 623 (5th Cir.1977) (rights conferred by EEOA go beyond those provided by the Fourteenth Amendment).

The EEOA also imposes on states the obligation to enforce the equal-educational-opportunity obligations of local educational agencies. *See, e.g., Idaho Migrant Council v. Board of Education,* 647 F.2d at 71 (state's department of education, board of education, and superintendent of public instruction have "an obligation to supervise the local districts to ensure compliance"). In *United States v. School District of Ferndale, Michigan,* for example, the government alleged, *inter alia,* that

> [t]he State defendants, notwithstanding their knowledge that the Ferndale elementary schools were being operated by defendant local school authorities on a racially segregated and discriminatory basis, have nevertheless continued to aid and assist the perpetuation and maintenance of that

racial segregation and discrimination through the provisions of state funds and other assistance, while failing and refusing to take any necessary or appropriate action to bring the operation of the Ferndale elementary schools into compliance with the Fourteenth Amendment to the United States Constitution.

577 F.2d at 1347. The district court in that case "apparently felt that the [EEOA] applied only to direct acts of discrimination, not to indirect assistance to districts violating the Act," and dismissed the EEOA claims against the state on the ground that "it was not the 'educational agency' that allegedly committed the proscribed discriminatory acts." *Id.* (footnote omitted). The Sixth Circuit reversed, stating that a proper EEOA claim is stated by the allegation that the state "*tolerated and provided assistance to a local school district which [it] knew to be engaging* in" the "discriminatory assignment of students and teachers," *id.*:

> *We do not believe that the State can escape liability under the Act merely because its support for the proscribed actions was indirect.* This Court has previously noted the substantial control exerted by Michigan state officials over local school operations.... In another Michigan desegregation case, we expressly ruled that state officials could be held jointly responsible with local authorities for segregated conditions in local schools, where the state officials had shown "consistent inaction in preventing increased segregation" and had consistently provided funding and other assistance to the local district.... Although that claim arose under the fourteenth amendment, *we think the principle of joint liability is applicable here as well. Congress plainly intended that the practices listed in § 1703 be ended. Such a goal can only be subverted by allowing states to knowingly support the prohibited practices with impunity.* This is particularly true where state assistance forms a sizable part of the local school district's budget. We seriously doubt that Congress intended to allow states to bankroll dual school systems, while enacting a statute

specifying remedies for the *elimination* of such systems.

*Id.* at 1347–48 (footnotes omitted; last emphasis in original).

We agree, and, given the discussion in Part II.A. above, we find these principles squarely applicable to the conduct of the State institutional defendants with respect to Yonkers. The district court in the present case correctly stated that "the literal and unambiguous language of section 1703 ... seem[s] to impose on states ... supervisory liability." *Yonkers VI,* 888 F.Supp. at 594 (citing *Yonkers V,* 880 F.Supp. at 239–41); *see also Yonkers V,* 880 F.Supp. at 239 ("if one were to set about to write a statute in a way that provided for vicarious state liability, one could not find language that was more clear and direct than that contained in § 1703 of the EEOA"). But the court believed that "supervisory" liability for the known acts of local and state entities was foreclosed by *Arthur.* It expressed the view that "Congress did not intend the statute to afford protections against racial discrimination beyond those already provided under the Fifth and Fourteenth Amendments of the Constitution," and that thus the EEOA should not be construed to impose on the states the very same "type of supervisory liability" that the court had found to be "foreclosed under 42 U.S.C. § 1983" by reason of *Arthur. Yonkers VI,* 888 F.Supp. at 594; *see also Yonkers V,* 880 F.Supp. at 240 ("the language of the EEOA on its face appears to impose on the states the very type of supervisory liability for the conduct of local actors that the *Arthur* decision foreclosed"). For the reasons stated in Part II.A. above, we have rejected the district court's view of *Arthur* with respect to the scope of the constitutional provisions; for the same reasons, we reject its view that the scope of the EEOA is similarly circumscribed. Plaintiffs' claims against the State, SED, and the Board of Regents under the EEOA should have been upheld.

The district court also noted that were it to uphold plaintiffs' claims under the EEOA, it would be required to revisit the question of the appropriate remedy for such a violation. The court correctly noted that the EEOA requires the court to make specific findings as to whether a denial of equal educational opportunity may be remedied by a method or combination of methods that does not include busing. However, the Act merely prioritizes methods, and does not eliminate busing. The Act itself states that while the EEOA is meant to "specify appropriate remedies for the elimination of the vestiges of dual school systems," 20 U.S.C. § 1702(b), its provisions "are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States," *id.* Thus, while the EEOA "manifests a purpose ... to guide and channel" judicial power, it is not to be construed to "restrict the breadth of discretion of th[e] court to determine what scope of remedy is constitutionally required." *Morgan v. Kerrigan,* 530 F.2d 401, 413 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); *see also Brinkman v. Gilligan,* 518 F.2d 853, 856 (6th Cir.) (construing the EEOA "as not limiting either the nature or the scope of the remedy for constitutional violations"), *cert. denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975).

Though in fashioning its remedial order at the outset the district court had not made the findings required for an order under the EEOA, it should make such findings on remand with respect to any remedial order to be fashioned and imposed on the State and its agencies.

### C. *Title VI*

In light of our conclusions that the defendant State officials may be held liable under § 1983 and that the State, SED, and the Board of Regents may be held liable under the EEOA, we need not address plaintiffs' challenges to the district court's rejection of their claims under Title VI.

### D. *The Claims With Respect to Housing and UDC*

The rejection of plaintiffs' claims against the State with respect to the segregative placement of new subsidized family housing, and that placement's effect of perpetuating and exacerbating segregation in the Yonkers schools, was premised on the district court's

view that the present case was not meaningfully distinguishable from *Arthur*. The district court should reconsider its dismissal of these claims in light of our discussion in Part II.A. above.

Likewise, the district court's ruling that the claims against UDC are barred by the statute of limitations should be reconsidered within the framework of our discussion in Parts II.A. and B. The cornerstone of the district court's analysis of whether the claims against UDC were timely, on the theory that UDC might be held liable for a "continuing wrong," was the court's view of the substantive extent of UDC's liability. The court began with the proposition that a duty to take steps to eliminate the effects of past school segregation will be imposed on a governmental entity only if it had a *"pervasive* role in matters *directly* affecting school attendance zoning," *Yonkers V*, 880 F.Supp. at 243 (emphases added), and it found that UDC had no direct or pervasive role. This view of the substantive extent of a governmental entity's liability was consistent with the district court's interpretation of *Arthur*.

■ As discussed above, however, a public entity may be held liable for the discriminatory effects of its knowing action or inaction in capitulation to the wishes of others that are known to be racially motivated; its role need not be direct or pervasive; it may be liable even if its conduct furthers the racially inspired goals only indirectly. Further, in the context of unlawful school segregation, state agencies or officials whose actions have contributed to that segregation have a duty "to take the necessary steps 'to eliminate from the public schools all vestiges of state-imposed segregation.' " *Milliken v. Bradley*, 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977) (quoting *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971)). "Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Board of Education v. Penick*, 443 U.S. at 459, 99 S.Ct. at 2947.

The district court's findings in the present case leave no doubt that UDC played a role in the perpetuation of school segregation in Yonkers. As the district court noted, there was a "close interrelationship between school segregation and segregative housing patterns in Yonkers, each affecting and aggravating the other." *Yonkers V*, 880 F.Supp. at 241; *accord Yonkers III*, 837 F.2d at 1234–35. The court found that UDC "worsened the already segregated state of housing and schools in the City" by its "knowing[ ] acquiesce[nce] and indeed participat[ion] in the segregative site selections." *Yonkers V*, 880 F.Supp. at 229. Thus, the perpetuation and exacerbation of segregated housing through UDC's participation in the placement of low-income housing only in heavily minority neighborhoods has had long-term segregative effects on the schools. These effects were easily foreseeable. SED officials were generally "very much aware of the problems" and had internal discussions "about the effect of publicly subsidized housing on racial imbalance in the schools" (Campbell Deposition at 62, 61); and they were aware "[t]hat Yonkers was going to build subsidized housing which would enhance segregation" (Sobel Deposition at 223). A City advisory group "relay[e]d concerns about racial imbalance in . . . schools in Yonkers to the UDC employees" (Trial Transcript at 710–11 (testimony of Yonkers Community Advisory Council member)); and the Yonkers City Manager testified that UDC's housing activity was reviewed by him and the Board of Education and that "all th[e] information" as to housing placement's "consequences on school enrollment" was "share[d] . . . with the UDC" (*id.* at 662). UDC did not persuade the district court that it had any legitimate reason for its acquiescence in segregative housing placements; the only reason found by the court was UDC's "aware[ness] of strong local opposition to the building of subsidized housing in the predominantly white areas," *Yonkers V*, 880 F.Supp. at 228.

Despite the evidence and the findings, it is unclear that the district court, in light of its view of *Arthur*, would have concluded, leaving aside any statute-of-limitations defense, that UDC had any liability whatever with respect to school segregation because the court found that UDC's role was not perva-

sive or direct. And it is unclear whether, in concluding that there was no "continuing" liability for purposes of the statute of limitations, the court's view of the temporal extent of UDC's liability was independent of its unduly restrictive view of the potential substantive extent of that liability. In sum, the court apparently viewed UDC as having committed no actionable wrong, and that view, which we have rejected, may well have affected the court's assessment of the degree to which the wrong could be deemed a "continuing" wrong.

We conclude that, in light of our rejection of the court's conclusion that governmental actors could not be held liable on the basis of the facts established here, it is appropriate for the district court, in the first instance, to reconsider its view of the duration of UDC's liability.

## CONCLUSION

For the reasons discussed above, the judgment of the district court dismissing the claims against the State defendants and UDC is vacated, and the matter is remanded for further proceedings not inconsistent with the foregoing.